UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

CAROLYN DENISE IRBY,

      Plaintiff,

v.

COMMISSIONER OF SOCIAL
SECURITY,

      Defendant.

18-CV-6446
DECISION & ORDER

---

On June 15, 2018, the plaintiff, Carolyn Denise Irby, brought this action under the Social Security Act ("the Act"). She seeks review of the determination by the Commissioner of Social Security ("Commissioner") that she was not disabled. Docket Item 1. On March 9, 2019, Irby moved for judgment on the pleadings, Docket Item 11; on May 8, 2019, the Commissioner responded and cross-moved for judgment on the pleadings, Docket Item 14; and on May 29, 2019, Irby replied, Docket Item 15.

For the reasons stated below, this Court grants Irby's motion in part and denies the Commissioner's cross-motion.

## **BACKGROUND**

### I.    **PROCEDURAL HISTORY**

On July 14, 2014, Irby applied for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB").[1] Docket Item 8 at 205-17. She claimed that she

---

[1] One category of persons eligible for DIB includes any adult with a disability who, based on her quarters of qualifying work, meets the Act's insured-status requirements. See 42 U.S.C. § 423(c); see also Arnone v. Bowen, 882 F.2d 34, 37-38

had been disabled since July 1, 2014, due to bilateral carpal tunnel syndrome, tendonitis, high blood pressure, back and knee pain, depression, prediabetes, a left foot injury, and heel spurs. *Id.* at 238, 242.

On December 18, 2014, Irby received notice that her application was denied because she was not disabled under the Act. *Id.* at 108-13. She requested a hearing before an administrative law judge ("ALJ"), *id.* at 114-15, which was held on May 11, 2017, *id.* at 42-77. The ALJ then issued a decision on June 13, 2017, confirming the finding that Irby was not disabled. *Id.* at 19-30. Irby appealed the ALJ's decision, but her appeal was denied, and the decision then became final. *Id.* at 5-7.

## II.   RELEVANT MEDICAL EVIDENCE

The following summarizes the medical evidence most relevant to Irby's appeal. Irby was examined by several different providers, but the opinions of Scott Hartman, M.D.; Carolyn Braddock, N.P.; Christie Bowen, N.P.; Seema Khaneja, M.D.; Lacy Morgan Develder, L.M.F.T.; and Yu Yu Lin, Ph.D., are of most significance to the claim of disability here.

### A.   Highland Family Medicine: Scott Hartman, M.D., and Carolyn Braddock, N.P.

Irby received primary care at Highland Family Medicine from Dr. Hartman and Nurse Practitioner ("NP") Braddock. *See id.* at 426-516. On January 19, 2015, Dr.

---

(2d Cir. 1989). SSI, on the other hand, is paid to a person with a disability who also demonstrates financial need. 42 U.S.C. § 1382(a). A qualified individual may receive both DIB and SSI, and the Social Security Administration uses the same five-step evaluation process to determine eligibility for both programs. *See* 20 C.F.R §§ 404.1520(a)(2) (concerning DIB); 416.920(a)(2) (concerning SSI).

2

Hartman diagnosed bilateral carpal tunnel syndrome, hypertension, depression, and uterine myoma, and he increased her dosage of Celexa, an antidepressant. *Id.* at 468.

On July 1, 2016, NP Braddock completed a medical source opinion questionnaire about Irby for the Social Security Administration. *See id.* at 412-13. NP Braddock noted that she had treated Irby three-to-four times per year since March 2011 and "[m]ore freq[uently] recently." *Id.* at 412. She diagnosed major depression (recurrent, moderate) generalized anxiety, carpal tunnel syndrome, chronic arm pain, and prediabetes. *Id.* NP Braddock opined that Irby could "[o]ccasionally" (6% to 33% of an eight-hour workday) twist, stoop, crouch/squat, climb ladders, climb stairs, and lift or carry less than ten pounds; "[r]arely" (1% to 5% of an eight-hour workday) lift or carry ten to twenty pounds; and "[n]ever" lift or carry more than twenty pounds. *Id.* at 412. She further opined that Irby could walk only two blocks "without rest or severe pain" and "frequently" (34% to 66% of an eight-hour workday) would experience "pain or other symptoms severe enough to interfere with [the] attention and concentration needed to perform even simple tasks." *Id.* Irby could sit for up to four hours in an eight-hour workday but only for thirty minutes at one time, and she could stand and walk for a combined total of two hours in an eight-hour workday but only for thirty minutes at one time. *Id.* at 413. NP Braddock concluded that Irby's impairments likely would last another twelve months and cause Irby to be absent from work "[a]bout three days per month." *Id.* at 412-13.

**B.     Christie Bowen, N.P.**

On October 1, 2014, NP Bowen evaluated Irby at her orthopedic surgeon's office. *See* Docket Item 8 at 332-33. She noted that Irby had carpal tunnel syndrome in both

3

hands and that this condition was worsening.  NP Bowen injected lidocaine into Irby's right hand for temporary relief and recommended that Irby undergo surgery.  *Id.* at 333.  She also opined that Irby could not lift more than 25 pounds or engage in "prolonged" bending or reaching.  *Id.*  NP Bowen reiterated these same limitations on November 14, 2014.  *Id.* at 337.

On January 7, 2015, NP Bowen noted that Irby was "recovering from right carpal tunnel release surgery performed 12/1/14" and that "[i]mprovement [was] anticipated with [Irby's] participation in formal therapy."  *Id.* at 414.  NP Bowen opined that Irby could not return to work because of a total temporary disability, an assessment that would be revisited monthly.  *Id.*

## C.    Seema Kheneja, M.D.

On December 9, 2014, Dr. Khaneja, a pediatrician,[2] completed a consultative internal medicine examination of Irby for the Social Security Administration.  *See id.* at 396-99.  Dr. Khaneja noted that Irby had "some pain" walking, particularly on her heels, but that her gait otherwise was "normal" and she did not need help getting on and off the examining table.  *Id.* at 397.  He diagnosed hypertension, prediabetes, obesity, depression, bilateral carpal tunnel syndrome, tendinitis/chronic bilateral arm pain, bilateral foot pain due to heel spurs, bilateral knee pain, chronic low back pain, fibroids, and asthma.  *Id.* at 399.  He opined that Irby had "mild to moderate limitations" in activities requiring "repetitive reaching, pulling, pushing, lifting, carrying, or repetitive fine

---

[2] Irby was 45 years old at the time of the examination.  *See id.* at 394.  The ALJ does not discuss why the Administration contracted for a pediatrician to evaluate an adult.

4

motor activity involving use of both hands," as well as in activities requiring "prolonged sitting, walking, repetitive twisting, bending, turning, kneeling, squatting, or climbing stairs."  *Id.* at 399.  Her further opined that based on Irby's history of asthma, "[she] should avoid exposure to smoke, dust, and other known respiratory irritants."  *Id.*

### D. Lacy Morgan Develder, L.M.F.T.

On January 15, 2016, Ms. Develder, a licensed therapist, completed a medical source opinion questionnaire about Irby.  *Id.* at 409-11.  She noted that she had been providing Irby with individual therapy every other week since September 2015, and she diagnosed major depressive disorder (recurrent, severe without psychotic features), generalized anxiety disorder, alcohol use disorder (mild), and family conflict.  *Id.* at 412.  Ms. Develder also noted that Irby had experienced "at least" two episodes of decompensation ("exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning") during the course of their four-month treatment relationship—the first in September 2015 and the second in January 2016, *id.* at 410-11; she believed that Irby likely had experienced additional episodes before she began treatment.  *Id.*  Ms. Develder opined that Irby had "[m]arked" limitations in the areas of activities of daily living and concentration, persistence, or pace; and "[e]xtreme" limitations in the area of maintaining social functioning.  *Id.* at 410.  She concluded that Irby's impairments likely would last at least another twelve months and cause Irby to be absent from work "more than four days per month."  *Id.* at 411.

### E. Yu Ying Lin, Ph.D.

On December 9, 2014, Dr. Lin, a psychologist, completed a consultative psychological examination of Irby.  Dr. Lin found that Irby presented as dysphoric and

5

dysthymic and diagnosed major depressive disorder ("moderate with anxiety distress"). *Id.* at 390-92. Dr. Lin opined that Irby could "follow and understand simple directions and instructions," "perform simple tasks independently," "maintain a regular schedule," "learn new tasks," "make appropriate decisions," and "relate adequately with others"; was "mildly limited" in "maintaining attention and concentration"; was "mildly to moderately limited" in "performing complex tasks independently"; and was "moderately limited" in "appropriately dealing with stress." *Id.* at 391. Dr. Lin believed that Irby's "[d]ifficulties [were] caused by stress related problems." *Id.*

### III. THE ALJ'S DECISION

In denying Irby's application, the ALJ evaluated Irby's claim under the Social Security Administration's five-step evaluation process for disability determinations. *See* 20 C.F.R §§ 404.1520(a)(2) (concerning DIB); 416.920(a)(2) (concerning SSI). At the first step, the ALJ determines whether the claimant is currently engaged in substantial gainful employment. §§ 404.1520(a)(4)(i); 416.920(a)(4)(i). If so, the claimant is not disabled. *Id.* If not, the ALJ proceeds to step two. §§ 404.1520(a)(4); 416.920(a)(4).

At step two, the ALJ decides whether the claimant is suffering from any severe impairments. §§ 404.1520(a)(4)(ii); 416.920(a)(4)(i). If there are no severe impairments, the claimant is not disabled. *Id.* If there are any severe impairments, the ALJ proceeds to step three. §§ 404.1520(a)(4); 416.920(a)(4).

At step three, the ALJ determines whether any severe impairment or combination of impairments meets or equals an impairment listed in the regulations. §§ 404.1520(a)(4)(iii); 416.920(a)(4)(iii). If the claimant's severe impairment or combination of impairments meets or equals one listed in the regulations, the claimant

6

is disabled. *Id.* But if the ALJ finds that no severe impairment or combination of impairments meets or equals any in the regulations, the ALJ proceeds to step four. §§ 404.1520(a)(4); 416.920(a)(4).

As part of step four, the ALJ first determines the claimant's residual functional capacity ("RFC"). *See* §§ 404.1520(a)(4)(iv); 404.1520(d)-(e); 416.920(a)(4)(iv); 416.920(d)-(e). The RFC is a holistic assessment of the claimant—addressing both severe and non-severe medical impairments—that evaluates whether the claimant can perform past relevant work or other work in the national economy. *See* §§ 404.1545; 416.945

After determining the claimant's RFC, the ALJ completes step four. §§ 404.1520(e); 416.920(e). If the claimant can perform past relevant work, he or she is not disabled, and the analysis ends. §§ 404.1520(f); 416.920(f). But if the claimant cannot, the ALJ proceeds to step five. §§ 404.1520(a)(4)(iv); 404.1520(f); 416.920(a)(4)(iv); 416.920(f).

In the fifth and final step, the Commissioner must present evidence showing that the claimant is not disabled because the claimant is physically and mentally capable of adjusting to an alternative job. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); 20 C.F.R. §§ 404.1520(a)(4)(v), (g); 416.920(a)(4)(v), (g). More specifically, the Commissioner bears the burden of proving that the claimant "retains a residual functional capacity to perform alternative substantial gainful work which exists in the national economy." *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999).

In this case, the ALJ found at step one that Irby had not engaged in substantial gainful activity since the alleged onset date. Docket Item 8 at 22. At step two, the ALJ

7

found that Irby had "the following severe impairments: bilateral carpal tunnel syndrome; depression; obesity; diabetes; and left foot bone spurs." *Id.* The ALJ found that Irby's hypertension, sciatica, pica disorder, degenerative joint disease of the knee, and asthma were non-severe. *Id.*

At step three, the ALJ determined that Irby did "not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." *Id.* More specifically, the ALJ found that Irby's bilateral carpal tunnel syndrome and left foot bone spurs did not meet Listing 11.14 (peripheral neuropathy); that "the signs, symptoms and laboratory findings of her obesity [were] not of such severity as found in any listing," *id.* at 23; and that her diabetes did not meet Listing 9.00B.5 (diabetes mellitus and other pancreatic gland disorders), *id.* The ALJ also found that Irby's mental impairments did not meet Listing 12.04 (depressive, bipolar, and related disorders) because Irby did not have at least two marked limitations or one extreme limitation in the areas of understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing herself. *Id.* at 23-24.

The ALJ then found that Irby had the following RFC:

> [Irby can] perform light work[3] . . . except she can only occasionally balance, crouch, crawl, stoop, bend or kneel. [She] can occasionally climb stairs but cannot climb ladders, ropes or scaffolds. [She] should have no more than occasional exposure to concentrated respiratory irritants such as dust,

---

[3] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. §§ 404.1567(b); 416.967(b).

8

>odors, fumes, gases and cold temperatures. [And she] can only occasionally use her hands to reach, grasp, finger and feel.

*Id.* at 24. In reaching this determination, the ALJ found that although "[Irby]'s medically determinable impairments could reasonably be expected to cause [her] alleged symptoms[,] . . . [Irby's] statements concerning the intensity, persistence and limiting effects of [those] symptoms [were] not entirely consistent with the medical evidence and other evidence in the record." *Id.* at 26 . The ALJ accorded "great weight" to NP Bowen's function-by-function analysis but "no weight" to her "conclusory statement regarding [Irby's] inability to work" because "it [was] temporary in nature and [spoke] to an issue which is reserved for the Commissioner. *Id.* at 26-27. The ALJ also gave "partial weight" to the opinion of Dr. Khaneja, *id.* at 27; "great weight" to the opinion of the consulting psychologist, Dr. Lin, *id.* at 26; and "little weight" to the opinions of Ms. Develder and NP Braddock, *id.* at 28.

At step four, the ALJ found that Irby was unable to perform her past relevant work as a hairstylist and child monitor. *Id.* But at step five, the ALJ found that "[c]onsidering [Irby's] age, education, work experience, and [RFC], there [were] jobs that exist[ed] in significant numbers in the national economy that [Irby] could perform." *Id.* at 29. Specifically, the ALJ credited the testimony of a vocational expert that Irby could find work as bus monitor, furniture rental consultant, or usher. *Id.*

## STANDARD OF REVIEW

"The scope of review of a disability determination . . . involves two levels of inquiry." *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987). The court "must first decide whether [the Commissioner] applied the correct legal principles in making the

determination." *Id.* This includes ensuring "that the claimant has had a full hearing under the . . . regulations and in accordance with the beneficent purposes of the Social Security Act." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (quoting *Cruz v. Sullivan*, 912 F.2d 8, 11 (2d Cir. 1990)). Then, the court "decide[s] whether the determination is supported by 'substantial evidence.'" *Johnson*, 817 F.2d at 985 (quoting 42 U.S.C. § 405(g)). "Substantial evidence" means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to correct legal principles." *Johnson*, 817 F.2d at 986.

## DISCUSSION

### I. ALLEGATIONS

Irby argues that the ALJ's mental and physical RFC determinations are erroneous. Docket Item 11-1. She specifically argues that the ALJ erred by not developing the record with respect to her mental illness, *id.* at 13-24, and by relying on stale opinions in determining her physical RFC, *id.* at 24-30. This Court agrees with both arguments and therefore remands the matter to the Commissioner for further development of the record and reconsideration of her mental and physical RFC.

## II. ANALYSIS

### A. Duty to Develop the Record and Irby's Mental RFC

Irby first argues that the ALJ erred in not filling gaps in the administrative record before determining Irby's mental RFC. Docket Item 11-1 at 13-24. This Court agrees.

"Because a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record." *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996) (citing *Echevarria v. Sec'y of Health & Human Servs.*, 686 F.2d 751, 755 (2d Cir. 1982)); *see also Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996) (same); 42 U.S.C. § 423(d)(5)(B) (requiring that the Commissioner, before rendering any eligibility determination, "make every reasonable effort to obtain from the individual's treating physician (or other treating health care provider) all medical evidence, including diagnostic tests, necessary in order to properly make such determination"). Thus, "where there are deficiencies in the record, an ALJ is under an affirmative obligation to develop a claimant's medical history 'even when the claimant is represented by counsel or . . . by a paralegal.'" *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999) (quoting *Perez*, 77 F.3d at 47)). On the other hand, "where there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim." *Rosa*, 168 F.3d at 79 n.5 (quoting *Perez*, 77 F.3d at 48)).

The Social Security Administration's own regulations reflect this duty, stating that "[b]efore we make a determination that you are not disabled, we will develop your complete medical history . . . [and] will make every reasonable effort to help you get medical reports from your own medical sources when you give us permission to request

11

the reports." 20 C.F.R. § 404.1512(d)(1). The regulations explain that "every reasonable effort" means that "we will make an initial request for evidence from your medical source or entity that maintains your medical source's evidence," and "at any time between 10 and 20 calendar days after the initial request, if the evidence has not been received, we will make one follow-up request to obtain the medical evidence necessary to make a determination." *Id.* § 404.1512(d)(1)(i) (emphasis added).

Here, the ALJ found that "because [the consulting psychologist,] Dr. Lin[,] determined that [Irby's] psychiatric symptoms were not significant enough to interfere with [her] ability to function on daily basis, psychiatric limitations in the residual functional capacity [were] unnecessary." Docket Item 8 at 27. In reaching this conclusion, the ALJ accorded "little weight" to the opinions of Ms. Develder, Irby's therapist, and NP Braddock, Irby's primary care provider, that Irby had more severe mental functioning limitations. *See id.* at 28 (explaining that "Ms. Develder [did] not have professional expertise, . . . a significant longitudinal relationship with [Irby,] and her findings [were] inconsistent with both the objective medical evidence of record and [Irby's] activities of daily living"); *id.* (explaining that "mental limitations [were] outside of Ms. Braddock's area of specialty and . . . [that] her findings [were] unsupported by the objective medical evidence of record as well as inconsistent with the claimant's activities of daily living").

The ALJ erroneously based the finding that Irby did not have any mental functioning limitations solely on the opinion of a consulting psychologist who examined Irby only once, without obtaining additional records to better understand Irby's longitudinal mental health. What is more, the record was replete with references to

12

Irby's mental illness and its manifestations, including a suicide attempt—and a subsequent mental hygiene arrest and week-long hospitalization—in September 2015. *See id.* at 513-24; *see also id.* at 507 (May 2016 treatment note from psychologist Barbara Gawinski indicating that Irby "remain[ed] at risk" for suicide and recommending "[s]pecial monitoring or intervention for suicide risk"); *id.* at 487, 493 (December 2015 and January 2016 treatment notes from NP Braddock indicating that Irby had suicidal ideations). And Ms. Develder observed in January 2016 that Irby had experienced "at least" two episodes of decompensation in the four months that she had received treatment from Ms. Develder—the September 2015 suicide attempt and a second episode in January 2016—and opined that Irby likely had experienced additional episodes before she began treatment. *Id.* at 410-11.

The record includes little longitudinal insight into Irby's mental health despite clear indications that records providing such insight likely existed. For example, although Ms. Develder had treated Irby every other week from September 2015 until January 2016, *see id.* at 409, none of her treatment records are in the record. Nor does the record include notes from Irby's prior therapist. *See id.* at 411 (Ms. Develder noting that Irby had seen a different therapist beginning in April 2015). Instead of obtaining this additional information, the ALJ relied on the opinion of a one-time consulting psychologist and two scattered references from non-mental-health treatment providers opining that Irby did not have any severe mental health issues. *See id.* at 26 ("Although there were some mental status exams which were positive for significant psychiatric symptoms, there were also some that were benign." (citing *id.* at 313, 427)).

Even assuming that these snapshots paint the picture of mental health that the ALJ describes,[4] they are just that—discrete moments cherry-picked from a three-year period. As the Second Circuit has observed, "[c]ycles of improvement and debilitating symptoms [of mental illness] are a common occurrence, . . . [and so] it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is [not disabled]." *Estrella v. Berryhill*, 925 F.3d 90, 97 (2d Cir. 2019) (second alteration in original) (quoting *Garrison v. Colvin*, 759 F.3d 995, 1017 (9th Cir. 2014)). And the failure to fill in the picture was particularly egregious here because the record evidences additional treatment notes, and so filling in the record may have been as simple as re-contacting Ms. Develder, not tracking down unknown treatment providers.

In short, because there was an "obvious gap[ ] in the administrative record" as it related to Irby's mental health and overall mental functioning, the ALJ was obligated to make a reasonable effort to fill that gap before rejecting Irby's application for disability benefits. *See Rosa*, 168 F.3d at 79 n.5 (quoting *Perez*, 77 F.3d at 48)). Because the

---

[4] The ALJ cited two pages in the record as supporting his finding that Irby's mental health issues were not disabling. The first is a June 2014 treatment note from Irby's orthopedic surgeon, Wilford L. Richardson, D.O., that addresses Irby's carpal tunnel syndrome. *See id.* at 313. It is unclear why the ALJ concluded that Irby's primary care provider did not have the specialized knowledge needed to evaluate mental health issues yet believed that an orthopedic surgeon was so qualified. The second is a September 2016 record from Irby's primary care physician, Kathleen Donahue, M.D., noting a "dysphoric mood and sleep disturbance" but also finding that Irby had neither suicidal ideations nor anxiety. *See id.* at 427. Given that Irby presented with a dysphoric mood, this evaluation does not appear to fit the ALJ's characterization of "benign." Thus, not only did the ALJ err by selecting two discrete snapshots of Irby's mental health rather than reviewing a longitudinal picture of her mental health, he cited evidence that may not even support the conclusion that Irby experienced temporary, isolated stability in her mental health.

ALJ did not do so and because that error was to Irby's detriment given the absence of any mental limitations in her RFC, the Court remands the matter so that the ALJ may develop the record and then re-evaluate Irby's application in light of the expanded record. On remand, the ALJ should be sure to consider both Irby's limitations in the specific functional domains as well as the impact of Irby's response to stress on her ability to work. *See Stadler v. Barnhart*, 464 F. Supp. 2d 183, 189 (W.D.N.Y. 2006) (citing SSR 85-15, 1985 WL 56857 (Jan. 1, 1985); *Welch v. Chater*, 923 F. Supp. 17, 21 (W.D.N.Y. 1996)) ("Because stress is 'highly individualized,'" the ALJ must "make specific findings about the nature of [Irby's] stress, the circumstances that trigger it, and how those factors affect [her] ability to work.").

### B. Stale Opinions and Irby's Physical RFC

Irby also argues that the ALJ erred by giving "great weight" to the opinions of Dr. Khaneja and NP Bowen as they pertained to her physical RFC. She argues that both opinions were "stale[ ]" because they were offered before Irby's two hand surgeries, after which Irby "continued to have symptoms and treatment." Docket Item 11-1 at 27. This Court again agrees.

Although "[a] stale medical opinion does not constitute substantial evidence to support an ALJ's findings," a "gap of time between when an opinion is rendered and the disability hearing and decision does not automatically invalidate that opinion." *Majdandzic v. Comm'r of Soc. Sec.*, 2018 WL 5112273, at *3 (W.D.N.Y. Oct. 19, 2018). For a medical opinion to be stale, not only must there be a significant period of time between the date of the opinion and the hearing date, there also must be subsequent treatment notes "indicat[ing] a claimant's condition has deteriorated" over that period.

15

*Whitehurst v. Berryhill*, 2018 WL 3868721, at *4, *5 (W.D.N.Y. Aug. 14, 2018). In other words, the "mere passage of time does not render an opinion stale," *id.*, but "significant developments" in an individual's medical history after the examination might. *Davis v. Berryhill*, 2018 WL 1250019, at *3 (W.D.N.Y. Mar. 11, 2018).

Here, the ALJ relied on the opinions of Dr. Khaneja and NP Bowen to determine that Kirby could "occasionally use her hands to reach, grasp, finger and feel." Docket Item 8 at at 24. Dr. Khaneja had opined in December 2014 that Irby was only mildly to moderately limited in "activities requiring repetitive reaching, pulling, pushing, lifting, carrying, or . . . fine motor activity involving use of both hands." *Id.* at 399. But Dr. Khaneja noted that Irby's "[right] wrist [could not] be evaluated as [Irby's] hand and wrist [were] in a bandage from her recent surgery." *Id.* at 398. Indeed, Irby had undergone surgery on her right hand on December 1, 2014, *id.* at 538, only two weeks before Dr. Khaneja examined her. A month later, NP Bowen opined that although Irby still was totally temporarily disabled, she "anticipated" improvement in Irby's condition "with participation in formal therapy." *Id.* at 405. Irby then underwent a second surgery—on her left hand—in March 2015. *Id.* at 539-41.

The ALJ cited only NP Bowen's January 2015 note for the proposition that Irby "did well following her right carpal tunnel release." *Id.* at 26. The ALJ then found, without citing any medical records, that "the wide variety of activities in which [Irby] was able to engage following the left carpal tunnel release supports the conclusion that [Irby] did well following her . . . [second] surgery." *Id.* In marked contrast, however, NP Braddock, to whose opinion the ALJ accorded "little weight," *id.* at 28, opined in July 2016 that "injections [and] surgery only partly help[ed]" Irby's bilateral hand pain and

16

that she could lift up to ten pounds only occasionally and 10-20 pounds rarely. *Id.* at 411-12.

The ALJ erred in at least three respects. First, Dr. Khaneja's evaluation was clearly stale with respect to the functioning of both hands: it was completed immediately after Irby's first surgery—so close that she could not evaluate Irby's right hand—and before Irby's left-hand surgery even took place. *See Pagano v. Comm'r of Soc. Sec.*, 2017 WL 4276653, at *5 (W.D.N.Y. Sep. 27, 2017) ("A stale medical opinion, like one that is rendered before a surgery, is not substantial evidence to support an ALJ's finding."); *Girolamo v. Colvin*, 2014 WL 2207993, at *7-8 (W.D.N.Y. May 28, 2014) (ALJ erred by giving great weight to medical opinions rendered before the claimant's second surgery).

Second, the only post-surgical evidence about Irby's right hand—an evaluation completed just one month after surgery on—stated that improvement was only "anticipated"—not that it had, in fact, been achieved. *See id.* at 405. Not only is that opinion inconclusive about the status of Irby's hand, it also is stale. And it certainly does not provide substantial evidence supporting the ALJ's RFC determination.

Third, without any medical evidence about Irby's left-hand recovery, the ALJ reached an independent medical conclusion regarding the degree to which Irby had recovered from the surgery. But "as a lay person, the ALJ simply was not in a position" to reach that conclusion—let alone determine whether her daily living activities "would in fact preclude the disabling [limitations] described by [NP Braddock] in [her]

17

assessment." *See Rosa*, 168 F.3d at 79 (original alterations omitted).[5] That is not to say that the ALJ was required to accord greater weight to the opinion of NP Braddock; but the ALJ could not reject NP Braddock's opinion in favor of the ALJ's lay opinion without citing and relying on competent medical opinion.

The ALJ thus relied on two stale opinions and the ALJ's own judgment in determining Irby's physical RFC. The matter therefore is remanded so that the ALJ may reconsider Irby's physical RFC and, if the ALJ so chooses, further develop the record as it pertains to Irby's physical RFC or identify existing records that support the ALJ's new determination.

---

[5] *See also Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998) ("In the absence of a medical opinion to support [an] ALJ's finding as to [a claimant's] ability to perform [a certain level of] work, it is well-settled that the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion. While an ALJ is free to resolve issues of credibility as to lay testimony or to choose between properly submitted medical opinions, he is not free to set his own expertise against that of a physician who submitted an opinion to or testified before him." (citation and original alterations omitted)); *Shaw v. Chater*, 221 F.3d 126, 135 (2d Cir. 2000) ("[W]hile a physician's opinion might contain inconsistencies and be subject to attack, 'a circumstantial critique by non-physicians, however thorough or responsible, must be overwhelmingly compelling in order to overcome a medical opinion.'" (quoting *Wagner v. Sec. of Health & Human Servs.,* 906 F.2d 856, 862 (2d Cir. 1990)).

## **CONCLUSION**

For the reasons stated above, the Commissioner's motion for judgment on the pleadings, Docket Item 14, is DENIED, and Irby's motion for judgment on the pleadings, Docket Item 11, is GRANTED in part and DENIED in part. The decision of the Commissioner is VACATED, and the matter is REMANDED for further administrative proceedings consistent with this decision.

SO ORDERED.

Dated: December 9, 2019
Buffalo, New York

                                              */s/ Lawrence J. Vilardo*
                                              LAWRENCE J. VILARDO
                                              UNITED STATES DISTRICT JUDGE